# Law and Equity

IN THE

# SUPREME COURT

OF THE

# STATE OF NEW YORK.

---

## CARTWRIGHT and others *vs.* GREENE and others.

A factor, under a *del credere* commission, becomes liable to his principal when the purchase money is due. As between him and his principal, he then, in effect, becomes the purchaser, or is substituted for the purchaser, and is bound to pay, not conditionally, but absolutely, in the first instance.

Hence, after the factor has sold the goods, on credit, and sent an account of sales to his principal, the latter may recover the price of the goods of the factor, without showing that he has endeavored to collect the money of the persons to whom the factor sold the goods.

And it is no defense to such an action that the sale made by the factor was an incomplete sale, so that, as between the factor and purchaser, the factor could not have enforced the same and collected the money of the purchaser, in consequence of the want of some formality, or memorandum or entry in writing, or *actual* delivery; where the factor has, in his correspondence, treated the sale as complete and binding; has stated and transmitted an account of the net proceeds of the same, after deducting commissions, &c.; has promised to remit the proceeds by the next mail; and has charged the purchasers,

and credited his principal, in his books; and the sale has been recognized and approved by the principal.

Where a factor has transmitted to his principal accounts of two different sales of the same goods, the principal, after having approved and recognized the first account, is not bound to notice, or object to, the second, at the peril of its being taken as a stated account, and held binding upon him.

*It seems* that the contract implied by a factor acting under a *del credere* commission does not make him a guarantor of the remittance.

On a consignment of goods by a merchant in New York, to a factor residing in California, for sale, the contract of the factor is to be performed in California, by remitting thence the proceeds of the sale, in the usual way; and in an action by the principal, to recover the proceeds, he is entitled to interest at the rate allowed by the laws of California.

THE plaintiffs were merchants in the city of New York; the defendants commission merchants and warehouse men in the city of San Francisco. Mr. H. H. King, who was also in mercantile business in the city of New York, was accustomed, as well as the plaintiffs on their own account, to make shipments for sale on commission to the defendants' house, which, about the date of the consignment in question, agreed with him to make the single charge of seven and one half per cent for their services, to cover commissions, *guaranty*, storage, &c.; such articles as cement and the like excepted. On the 1st of December, 1852, Mr. King shipped to the defendants' house one hundred kegs of butter on board the *Jacob Bell*, then lying in the port of New York and bound for San Francisco, and on the same day indorsed the bill of lading to the plaintiffs, of whom the butter had been purchased and to whom he was indebted, who on the 18th of the same month consigned the butter to the defendants' house on his account, and sent them, with the invoice, a letter of advice, instructing the defendants to dispose of it according to the instructions of Mr. King, remitting to them the proceeds in gold. The transfer of the bill of lading to the plaintiffs was to secure them for his purchases, still unpaid. The defendants received and accepted the consignment under the agreement already mentioned. On the 21st of April and 16th of July, 1853, they sold two kegs of the butter at 50

Cartwright *v.* Greene.

and 42½ cents, and as to these there is no question. On the 9th of November, 1854, the defendants, as factors under this guaranty commission, sold ninety-eight kegs of the butter, and a few days afterwards sent an account of sales, signed by them and dated November 11, 1854, to the plaintiffs, and another like account of sales, signed by them, to Mr. King, stating that after deducting charges; including freight, state duty and such guaranty commission of 7½ per cent, the net proceeds to the plaintiffs were $1685.06, with a letter to each, saying that they had sold the butter at 27 cents per pound, payable December 1, 1854. In that to the plaintiffs the defendants promised to remit the proceeds by the next mail. The defendants sent duplicates of such account of sales, by the following steamer, to the plaintiffs and Mr. King, and on the 12th of December Mr. King, and on the 20th of December the plaintiffs, wrote approving such sales, the plaintiffs saying : " The sales are quite correct and satisfactory." Thus the sale was, on the one side, stated and restated, and on the other side accepted and ratified. On the 30th of November, the defendants " confirm all that we [they] have written," but instead of remitting according to their promise and guaranty, say that perhaps " the proceeds of the one hundred kegs, by the *Jacob Bell,* will go by the steamer of the 15th December." On the 15th of December they say that they " have little to say, except to confirm our letters by the last several mails." " We have *no more sales* to report for account of Mr. King, except the closing account of one of the invoices of four hogsheads." On the 30th of December they wrote to the plaintiffs that they had been obliged to allow soakage two pounds a keg, and had charged them that on each of the ninety-eight kegs, less commission. " None of this last lot is paid for ; the *purchaser is good ;* we retain the butter, and *he pays* 3 per cent per month interest, which will go to your credit. We have made no further sales." To Mr. King they write : " We have not yet collected any thing upon the sale of the 98 per *Jacob Bell. The purchaser,*

*however, is good* and *is paying* 3 per cent upon the amount, which we shall place to your credit." On the 15th of January, 1855, the defendants wrote that they might get something before they closed their letter "on account of the sale of 100 kegs butter by *Jacob Bell,*" and if so, they should enclose it. On the 31st of January, the defendants acknowledging the letter of the plaintiffs of the 4th of that month, in which they say: "By the next mail we hope to receive remittance in full for proceeds of sale per *Jacob Bell,*" write: "The purchaser of the butter has been in to say that he will pay part by next mail." Thus, from time to time they confirmed the sale, but though they guaranteed it, and though the purchaser was good, put off the plaintiffs on the ground that the purchaser, whose name was never disclosed, had not paid to them. On the same day of the interview with the purchaser last mentioned, or under that date, 31st of January, 1855, his firm were charged by the defendants $35.58 for storage of the butter. That was their custom, well understood by their customers, after the time fixed for the payment for the goods, and the purchaser understood the custom perfectly. On the 9th of November, 1854, the defendants had charged in their books, J. L. Taggard & Co., and credited the sale. On the 11th of November they had credited the plaintiffs with the net proceeds of the sale. On the 26th of December, the plaintiffs were charged and the purchasers credited $52.92 for soakage. At the time of the sale the kegs were all in store, and eight or ten of them were opened and were examined by the purchaser. The defendants "sold the 98 kegs butter, marked diamond, ex-*Jacob Bell,*" being the whole invoice, and gave a bill of parcels. According to the testimony of one of the defendants, the defendants did not deliver the butter out of the store. They retained it in effect for their own security. "Taggard & Co. were willing at any time to take the butter, if the defendants were willing to trust them." No part of the money appears to have been paid by them. On the 24th of February, 1855,

a commercial crisis had commenced in San Francisco, and the defendants wrote to Mr. King that the butter was not paid for, but they had it in store; that they feared "*now* that the purchaser will not *fulfill,* though he had previously paid as well as any one, but now he, like most other of the jobbers, will be affected by the crisis;" that they should not deliver until they got the money. Having thus failed to fulfill their agreement of guaranty, and as they now claim, neglected to take on themselves the risk for which they were compensated, they attempted to throw the loss on the plaintiffs and Mr. King. On the 30th of March, 1855, they wrote to the plaintiffs, for the first time, that the purchaser "did not fulfill." On the 31st of March, 1855, they reversed all their entries in their books in regard to the sale. In the summer of 1855 the defendants, of their own motion, resold the ninety-eight kegs, at a much less price, to another purchaser, and sent another account of sales and an account current, including other sales besides those of the ninety-eight kegs, to the plaintiffs, together with a draft for the balance of said account current. The plaintiffs retained the draft, which was only for a part of the amount due them, but both they and Mr. King dissented from the accounts. Without any particular examination they saw and said that the charge for storage, under the agreement with Mr. King, was wrong, and endeavored to get on this account some $1500, besides interest, out of the defendants' hands, claimed to be wrongfully detained. That question was in contest between the parties until 1859, when the matter of storage was submitted by Mr. King and the defendants to arbitrators, and on their decision in July of that year, the defendants paid over $1067.28 so detained; the account, as Greene himself says, during all the time remaining open. Mr. King having got this amount from the hands of the defendants, the plaintiffs immediately demanded the proceeds of the original sale, and the demand being refused, and one of the defendants found here, brought this suit. The claim for storage was made before the arbi-

trators, adjusted and paid on the basis of the first account
of sales, which was thus recognized.    When the last account
was rendered, Mr. Swain, one of the plaintiffs, who had had
charge of the accounts and correspondence, had gone out of
the firm, and to California to reside, and by mistake the fact
that there were two different accounts of sales of the same
goods was at that time, and subsequently, overlooked.    No
critical examination was made, the storage was in dispute,
no account was kept by the plaintiffs with the defendants,
but only with King, to whom remittances were credited as
they might be received, and no accounts of sales were entered
in the plaintiffs' books.    The plaintiffs held the goods only
as security, through an indorsement of the bill of lading;
they were to be disposed of according to the instructions of
Mr. King, the proceeds to be remitted to them.    Before sale
Mr. King, and not the plaintiffs, had the control of the dis-
position of the goods; the plaintiffs, and not Mr. King, of
the proceeds afterwards.    Both were, however, interested.
A formal assignment from King to the plaintiffs was made
in 1860, for greater caution.    The complaint consisted of
two counts, one claiming the net proceeds of the sale of
November 9, 1854, with interest, on the footing of the account
of sales rendered, and the second alleging a breach of the
undertaking of the defendants as factors, to obtain the best
prices that could be obtained, and to act with fidelity, dili-
gence and care, and account and pay over the proceeds, thus
presenting distinctly the alternatives; first, that the defend-
ants did render such account and make and guaranty such
sale; secondly, that if they did not, or such sale wanted any
necessary formality, as is now pretended, it was through their
fault and neglect and breach of duty.    The defendants, in
their answer, simply take issue on some of the allegations
of the complaint.    They deny that they made such sale, and
they deny their alleged neglect or breach of duty.    No new
matter or defense is set up.    The issues so formed were the
only ones to be, or which were, tried.    At the close of the tes-

Cartwright *v.* Greene.

timony, the court asked the defendants' counsel if there was any question of fact to submit to the jury, and he said he knew of none, and the court said it was of the same opinion; and that the plaintiffs were entitled only to seven per cent interest on their recovery. To the latter part of which rulings, as to interest, the plaintiffs excepted. The defendants' counsel then requested the court to charge the jury as follows: *First.* That the plaintiffs can not recover in this case unless they show that they have first had recourse to Taggard & Co.; and that if the jury believe that the plaintiffs or King have neither of them made any effort to recover from Taggard & Co. they can not recover from the defendants. The court declined so to charge; and the defendants excepted. *Second.* That this bargain for the sale to Taggard & Co. was an incomplete sale under the laws of California, not binding upon either of the parties, and that therefore these defendants are not responsible. The court declined so to charge, and the defendants excepted. *Third.* That the plaintiffs having kept this account from 1855 to 1859 without any objection in regard to that second sale, it was a stated account, and they are bound by it, and they can not now open it, except for fraud. The court declined so to charge, and the defendants' counsel excepted. The court directed a verdict for the plaintiffs for $2207.98, being the net proceeds of such sale and interest, deducting the amount included on account of such butter in the draft remitted.

The jury found a verdict in favor of the plaintiffs for that sum, and the court ordered that the exceptions herein be heard in the first instance at general term, and the judgment, in the meantime, to be suspended.

*Wm. Bliss,* for the plaintiffs.

*O. Bushnell,* for the defendants.

*By the Court,* SUTHERLAND, J. The question presented by the refusal to comply with the first request to charge the

jury, is as to the nature of the contract between a factor and his principal, when acting or selling under a *del credere* commission.

It being conceded, in this case, that the defendants were acting under a *del credere* commission, the court was asked to charge that the plaintiffs could not recover without showing that they had had recourse to Taggard & Co.; that is, without showing that they had endeavored to collect the money of Taggard & Co., to whom the plaintiffs alleged the defendants had sold the butter.

It seems settled, at all events in this state, that a factor under a *del credere* commission becomes liable to his principal when the purchase money is due; that as between him and his principal, he then in effect becomes the purchaser, or is substituted for the purchaser, and is bound to pay, not conditionally, but absolutely, in the first instance. (*Sherwood* v. *Stone*, 14 *N. Y. Rep.* 267, 270. *Wolff* v. *Koppel*, 5 *Hill*, 458. *S. C.* 2 *Denio*, 368. *Milliken* v. *Byerly*, 6 *How. Pr.* 214.) The court, therefore, was right in not complying with the first request to charge.

The second request to charge was substantially a request to charge, or hold, that if the sale to Taggard & Co. was an incomplete sale, so that as between the defendants and Taggard & Co. the defendants could not by the laws of California have enforced the sale and collected the money of Taggard & Co., in consequence of the want of some formality, or memorandum or entry in writing, or *actual* delivery, the plaintiffs could not recover in this action.

I think, under the undisputed facts and circumstances of this case, the court properly refused so to charge, or hold.

There was no question of fact for the jury. This was conceded by the counsel for the defendants. The question was not whether the defendants could have recovered against Taggard & Co., but whether the plaintiffs ought to recover against the defendants.

In their correspondence, the defendants had treated the

Cartwright *v.* Greene.

sale as complete and binding; they stàted and transmitted an account of the net proceeds of the same, after deducting commissions, &c. and promised to remit proceeds by the next mail. They charged Taggard & Co. and credited the plaintiffs, in their books. The butter was not delivered to Taggard & Co., the defendants retaining it for their security; but they charged Taggard & Co. for storage, according to custom. The sale was recognized and approved of by the plaintiffs.

It appears to me, that under these circumstances, *as between the plaintiffs and the defendants,* the sale ought to be considered as complete; that the defendants ought not to be permitted to say that it was not. I think, therefore, that the second request to charge was properly refused.

The third and last request to charge assumed a fact that did not exist. The plaintiffs did not retain the account of the second sale *without objection;* but if they had, no such legal inference followed as the request implied. The defendants had transmitted accounts of two different sales, the first of which was approved and recognized by the plaintiffs. I know of no principle which bound them to notice the second account.

As to rate of interest, I held at the circuit, that the plaintiffs were entitled to seven per cent only, the plaintiffs claiming the California rate of ten per cent. The case contains no exception to this ruling, but it seems that by stipulation the parties have agreed to have the question disposed of as if there had been an exception.

I must confess that I do not see why *Fanning* v. *Consequa,* (17 *John.* 511,) does not settle this question of interest in favor of the plaintiffs. (*See also Scofield* v. *Day,* 20 *John.* 102; *Curtis* v. *Leavitt,* 15 *N. Y. Rep.* 87; *Hyde* v. *Goodnow,* 3 *id.* 266.)

It seems that the contract implied by a factor, acting under a *del credere* commission, does not make him a guarantor of the remittance. (*Leverick* v. *Meigs,* 1 *Cowen,* 646. *See*

*also* 10 *John.* 286.) Does it not follow that the defendants' contract with the plaintiffs was to be performed at San Francisco, by remitting thence the proceeds in the usual way?

As the attorneys have expressly stipulated that the verdict may be amended accordingly, I think that it may be so amended; and that the plaintiffs are entitled to judgment thereon, as thus amended, with costs.

Judgment accordingly.

[NEW YORK GENERAL TERM, June 4, 1866. *Sutherland, Clerke* and *Geo. G. Barnard*, Justices.]